JENNY R. TURNER, *Appellee,* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant.*

No. 16,621.

SYLLABUS BY THE COURT.

NEGLIGENCE—*Placing Employee at Work in Dangerous Place —Notice.* It is negligent in a railroad company to place an employee in an imminently dangerous place to work, without warning or instruction for his guidance, when he is ignorant of the dangers to be apprehended and of the means by which to avoid them.

Appeal from Cowley district court. Opinion filed November 5, 1910. Affirmed.

*William R. Smith, O. J. Wood, Alfred A. Scott,* and *J. E. Torrance,* for the appellant.

*A. M. Jackson,* and *A. L. Noble,* for the appellee.

The opinion of the court was delivered by

GRAVES, J.: The appellant operates its railroad through Arkansas City, in Cowley county.. Fred R.. Turner was an employee of the appellant at that place. at the time he received the injuries herein alleged. The injuries caused his death soon after they were received.. The widow of the deceased commenced this action in the district court of Cowley county to recover damages for the loss of her husband, and was awarded the sum of $10,000. The railroad company appeals.

At the time the deceased was injured he was in charge of the turntable. He had been at that work only three or four days. He had previously been in charge of the cinder pit. The foreman of the gang to which Turner belonged had been directed to instruct him in the duties belonging to his work. He was given some instruction, but the foreman omitted to give any direction or instructions concerning the use of the pushpole by which he was injured. At the time of his injury the deceased was assisting in placing an engine having no steam, called a dead engine, upon the turntable by the use of a "pushpole" and an engine having steam and called a live engine. The two engines ran upon parallel tracks which converge toward the turntable and come very close together. When near the turntable the push-pole is placed from one engine to the other, and by this means the dead engine is pushed upon the turntable. The deceased never assisted in this work before, and, so far as is known, never saw it done. Under the direction of the foreman he assisted in placing the push-pole in proper position, where it was held by the pressure of the engine. He was then left there, without instructions, and was caught beween the pole and the tender of the dead engine and crushed. Upon the trial the jury found that the injury was caused by the negligence of the appellant, and the appellee insists

that the special findings sustain this conclusion. They are as follow:

"(1) Ques. Do you find that the defendant's negligence caused the death of the deceased, Fred R. Turner? Ans. We so find from evidence.

"(4) Q. Do you find that the injury of the deceased was due to any defects in the engines, cars, machinery, tracks or other property of the defendant? A. Lack of air in engine contributory.

"(5) Q. If you answer the next preceding question in the affirmative, state what particular defects in what particular property or machinery caused the injury. A. Lack of air in engine.

"(7) Q. What do you find were the duties of Fred R. Turner at the time of his injury by reason of his employment by the defendant? A. Operate turntable and clean up around or near it.

"(8) Q. How long do you find he has been thus employed? A. About three days.

"(9) Q. How old was Fred R. Turner at the time of the accident? A. Twenty-two years and past.

"(10) Q. How long had he worked in the yards of the defendant near the turntable at the time of the accident? A. Three days.

"(11) Q. How long had Fred R. Turner worked for the defendant at or near the turntable in the yards of the defendant before the injury occurred? A. About three days.

"(12) Q. Had Fred R. Turner during the time he was employed in the yards of the defendant at and near the turntable had opportunity to observe the conditions of the track and ground at and near the turntable? A. Yes, for three days.

"(13) Q. Did Fred R. Turner, during his employment by the defendant at and near the turntable in the defendant's yards at Arkansas City, have an opportunity to observe the manner and methods of the employees of the defendant in placing engines on the turntable? A. No.

"(14) Q. Had Fred R. Turner, during his employment at the turntable and in the yards, ever seen the employees of the company placing dead engines on the turntable with the pushpole prior to the time he received his injury? A. No.

"(15) Q. Do you find that Fred R. Turner had opportunities to see the manner or methods in which the engines were placed upon the turntable by the defendant by means of the pushpole? A. No.

"(16) Q. Was it the duty of Fred R. Turner, during the time he was employed at the turntable, to assist the hostler, foreman and employees of the defendant in placing dead engines on the turntable? A. His duty when ordered.

"(17) Q. At the time of the injury was Fred R. Turner acting within the line of his duty? A. Yes.

"(18) Q. Was the manner in which the dead engine was attempted to be put on the turntable at the time of the injury of Fred R. Turner the ordinary and usual method employed by the defendant for placing dead engines on the turntable under similar conditions and circumstances? A. No.

"(21) Q. Do you find that Fred R. Turner received his injury alleged to have caused his death on the 24th day of October, 1907? A. Yes.

"(22) Q. Do you find that Fred R. Turner received the injury alleged to have caused his death while assisting in placing a dead engine on the turntable by means of a live engine and a pushpole? A. Yes.

"(23) Q. If you answer the next preceding question in the affirmative, then was Fred R. Turner ordered to assist in the placing of the dead engine on the turntable? A. Yes.

"(24) Q. If you answer the next preceding question in the affirmative, state who ordered him to assist in the moving of the dead engine on the turntable. A. Nix, W. L.

"(26) Q. If you answer that Fred R. Turner assisted in placing the pushpole between the engines, state what part of the pushpole the said Fred R. Turner held and how he held it. A. North end. Held with his hands.

"(27) Q. If you answer that the said Fred R. Turner assisted in the placing of the pushpole between the engines, state where the said Fred R. Turner was when the live engine backed up and tightened the pushpole. A. Between middle and north end of pole.

"(28) Q. State in what manner the live engine was backed up against the pushpole, that is, whether done slowly or rapidly. A. Slowly.

"(29)  Q.  Was there any negligence on the part of the hostler in charge of the live engine in backing up to tighten the pushpole, and if so, state in what the negligence consisted?  A.  No.

"(30)  Q.  After the pushpole was tightened did the hostler, before backing up or kicking the dead engine, warn W. L. Nix to look out or get out of the way?  A. Yes.

"(31)  Q.  If you answer the next preceding question in the affirmative, state in what manner he warned him.  A.  'Look out, Billy—she has no air.  I am going to give her a kick.'

"(32)  Q.  If you answer the next but one of the preceding questions in the affirmative, state where Fred R. Turner was at the time of the warning and where W. L. Nix stood.  A.  Turner at north end of pole and Nix probably in rear of dead engine.

"(33)  Q.  Was there anything to prevent Fred R. Turner from seeing the danger of being between the pushpole and the dead engine when the same was being pushed by the live engine on the turntable, and, if so, what was it?  A.  His lack of instruction and inexperience in doing such work.

"(34)  Q.  Was there any sudden emergency which arose which required Fred R. Turner to act quickly in going into a place of danger, and, if so, what was it? A.  No.  He was there as ordered by Nix.

"(35)  Q.  Before the live engine began to move or kick the dead engine, and after the pushpole had been placed, did W. L. Nix warn or signal Turner to go back out of the way?  A.  No.

"(36)  Q.  Did Turner, before the hostler turned on the steam and kicked the dead engine, move back north between the two engines to a place out of danger? A. No.

"(37)  Q.  Where did you find Turner was standing at the time the hostler moved the live engine back to kick the dead engine?  A.  At north end of pole, with hands on pole.

"(38)  Q.  If he had remained where he was then standing could the injury have occurred?  If so, state how.  A.  No.

"(39)  Q.  Do you find that Fred R. Turner was directed by anyone to go in between the pushpole and the dead engine after the pushpole had been placed

and tightened and the hostler had signaled his intention of moving back? A. No, he was already there.

"(41) Q. Did Fred R. Turner have hold of the pushpole when the hostler kicked the dead engine? A. Yes.

"(42) Q. If you answer the next preceding question in the affirmative, state whether or not the said Fred R. Turner walked along with the engine moving back and held to the pushpole until the injury occurred. A. He did.

"(43) Q. Was the place where the injury occurred one of obvious danger, which could have been seen or noticed by a person of ordinary prudence? A. No, if uninstructed and not shown it.

"(44) Q. If you find in any of the preceding questions that the engineer gave warning or notice that he was about to back up before doing so, state whether or not W. L. Nix heard the warning. A. Yes.

"(45) Q. If you answer the next preceding question in the affirmative, state whether or not Fred R. Turner heard the warning. A. He probably did, but did not understand it was for him.

"(46) Q. If you answer the next preceding question in the negative, or that you do not know, then state whether on not he was as near the hostler when the warning was given as W. L. Nix. A. Yes, as near.

"(47) Q. If you answer that the said Fred R. Turner was as near the hostler as W. L. Nix at the time that the hostler gave the warning, state whether or not his opportunity for hearing was as good as that of W. L. Nix. A. Not so good, on account of escaping steam near him.

"(49) Q. Was there any negligence on the part of the defendant's hostler in backing up or kicking the dead engine after the pole was placed, and, if so, state what it was? A. Yes, in using an engine without air.

"(50) Q. Could the deceased have placed the pushpole as well by standing on the side opposite to that where he was standing when he received the injury? A. No.

"(51) Q. Would the deceased have been in a safer place if he had been on the opposite side, or west side, of the pushpole? A. No.

"(52) Q. Would the west, or opposite, side of the pushpole from where the injury occurred have been safer than the place where the deceased stood when the injury occurred? A. No.

"(53) Q. If you answer the preceding question in the affirmative, was there anything to prevent the deceased from seeing or knowing that the opposite side of the pushpole from where he received his injury was safer than the position kept by him? A. Was not safer.

"(55) Q. After the pushpole was placed, and before the live engine kicked or pushed the dead engine, could the deceased have stepped back north a few steps to a place of safety? A. He could, but had no orders thus to act.

"(56) Q. Could deceased, with ordinary care and ordinary intelligence, have discovered the danger in which he was placed? A. No.

"(57) Q. Could the deceased, with ordinary care and ordinary intelligence, have known that the opposite side of the pushpole was safer than the position occupied by him? A. No.

"(58) Q. Did Fred R. Turner understand the risk to which he was exposed when he went or remained between the pole and the dead engine? A. No.

"(59) Q. By the exercise of common observation would Fred R. Turner have known the risk to which he was exposed by being or remaining between the pushpole and the dead engine? A. He could not, because of his inexperience and lack of instruction.

"(60) Q. If you answer the preceding question in the negative, state what prevented him from knowing it. A. His inexperience.

"(61) Q. Was the danger to which Fred R. Turner was exposed open to common observation? A. No.

"(62) Q. Was the danger to which Fred R. Turner was exposed as well known to him as to the defendant company? A. No.

"(63) Q. If you answer the last question in the negative, state what prevented the said Fred R. Turner from knowing the danger to which he was exposed. A. Inexperience and lack of instruction.

"(64) Q. After the pushpole was placed could Fred R. Turner have walked back north between the engines and gotten out of danger before the hostler kicked the dead engine? A. He could not, consistently with his duty as he understood it.

"(65) Q. If you answer interrogation No. 64 in the

21—83 KAN.

negative, state what prevented him from doing so. A. Was there on duty in obedience to orders.

"(66) Q. After the pushpole was placed could Fred R. Turner have passed south under the pole and around the end of one of the engines as Nix did, and thus avoided the injury? A. He could not and have obeyed orders.

"(67) Q. If you answer interrogation No. 66 in the negative, state what would have prevented him from doing so. A. His duty as he understood it.

"(68) Q. At the time of the injury of Fred R. Turner, could the defendant have placed its live engine north of the dead engine on the same track and have pushed it on the turntable? A. Yes.

"(69) Q. Was the cinder pit on the track north of the dead engine in such shape that the live engine could have been brought around in that way? A. Yes.

"(70) Q. Did deceased have good eyesight? A. Yes.

"(71) Q. Did deceased have good hearing? A. Yes.

"(72) Q. Was deceased Fred R. Turner an ordinarily prudent man? A. Yes."

These findings show that the deceased was in a place of great danger and was in the performance of a duty which was entirely new to him. He did not know the dangers to be apprehended nor how to protect himself therefrom. He was left there without warning or instruction. This was negligence. The circumstances were such that he must have supposed that he was expected to remain at his post to protect the pushpole from falling out of place or to perform some other duty of which he would receive instruction. This is indicated by the findings of the jury. We do not think contributory negligence can be fairly imputed to him.

Complaint is made of certain instructions refused and others that were given, but after a careful examination of them we are unable to find material or prejudicial error in the rulings relating to the instructions.

The judgment of the district court is affirmed.